IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 13, 2015

**STATE OF TENNESSEE v. VARQUEZ K. SAILS**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1179     Mark J. Fishburn, Judge**

_____

**No. M2014-01343-CCA-R3-CD – Filed August 26, 2015**

_____

The Defendant, Varquez K. Sails, was convicted by a Davidson County Criminal Court jury of second degree murder, first degree felony murder, and employing a firearm during the commission of or attempt to commit a dangerous felony. The trial court merged the homicide convictions, dismissed the count pertaining to the weapons offense, and imposed a life sentence. *See* T.C.A. § 39-13-202(a)(2) (first degree felony murder) (2014). On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress an identification of him from a photograph lineup, (2) the evidence is insufficient to support the conviction, (3) the trial court erred in excluding evidence that an eyewitness to the crime misidentified defense counsel as the defense investigator on a separate occasion, (4) the trial court erred in prohibiting cross-examination regarding a witness's gang affiliation, (5) the trial court erred in excluding testimony regarding the software used to generate the photograph lineup, (6) the trial court erred in excluding an expert witness's opinion testimony regarding whether the photograph lineup was impermissibly suggestive, (7) the trial court erred in failing to grant a mistrial when a witness testified that the Defendant had been incarcerated previously, (8) the State engaged in prosecutorial misconduct during closing argument, and (9) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT. L. HOLLOWAY, JR., JJ., joined.

Kyle Mothershead, Nashville, Tennessee, for the appellant, Varquez K. Sails.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. (Torry) Johnson III, District Attorney General; and Dina Shabayek and Robert

Elliott McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction pertains to the May 21, 2011 fatal shooting of Dustyn M. Taapken. The Defendant was indicted jointly with Christopher M. Epps, although the police did not identify the Defendant as a suspect until almost one year after the shooting.

### Suppression Hearing

The Defendant sought to suppress Steven Simpson's identification of him as one of the perpetrators from a photograph lineup. He contended that the photograph lineup was impermissibly suggestive.

At the suppression hearing, Stephen Simpson testified that he was present at the victim's house when the victim was killed. He said he and the victim were playing video games when three men arrived and came inside. Mr. Simpson said he knew one of the men as "Joe," who was identified through other evidence as Joseph Snorten. Mr. Simpson said that the second man was heavyset and that the third had shoulder-length dreadlocks, a darker complexion than the heavyset man, and tattoos on his arms, neck, and face. He said the three men were in the living room with him and the victim for twenty to twenty-five minutes before the third man went down a hall in the house. When the third man returned, he held a gun. Mr. Simpson said that he and the victim were made to get on the floor and that he heard gunfire behind him. Mr. Simpson said one of the men ran out the door but returned and told the heavyset man to leave with him. Mr. Simpson said he had not ingested prescription medication, alcohol, or drugs that evening.

Mr. Simpson testified that after meeting with the police immediately after the shooting, he did not meet or talk with the police until he was contacted about attending a meeting at the district attorney's office. He said that at the meeting, a detective showed him photographs to see if he could identify anyone. He was given written instructions and a paper to sign after he made an identification. The paper stated that he had not based his identification on any factors other than the photographs. He was unsure whether he received any papers before he viewed the photograph lineup. He said he never met or spoke with Joseph Snorten about the third suspect after June 2011.

Metro Nashville Police Detective Corey Wall testified that he spoke with Mr. Simpson, who identified himself as the victim's friend, at the scene. Detective Wall said Mr. Simpson described three suspects: (1) a tall, skinny black male named Joe who Mr. Simpson had met a few times previously, (2) a shorter, heavyset man, who was later identified as Christopher Epps, and (3) a man of average build, with dreadlocks, and

being neither the tallest nor the shortest of the three suspects. Detective Wall said Mr. Simpson stated that the short, heavyset man asked to use the restroom, went to the back of the house, and returned with a gun, at which point, the robbery occurred. Despite the victim's house having a marijuana odor when officers arrived and the victim's having been a marijuana dealer, Detective Wall did not question Mr. Simpson about any drug use before the incident.

Detective Wall testified that in the course of the investigation, he spoke to Joseph Snorten, who provided his accomplices' nicknames, "Goldie" and "Quez." Detective Wall said it took him almost a year to develop the Defendant as a suspect based upon the nickname. He thought he initially received the Defendant's nickname with a different spelling and said he received the correct spelling in May 2012. He was unable to narrow a list of suspects until he received the May 2012 information. After Mr. Snorten provided the correctly spelled nickname, Detective Wall showed him a photograph of the Defendant, and Mr. Snorten affirmed that the Defendant was one of the men involved in the crime.

Detective Wall compiled a six-subject photograph lineup using a computer database, from which he searched for individuals with similar race, sex, hair, and facial hair. Because the Defendant had tattoos, he used a marker to obscure the most noticeable tattoo, which was between the Defendant's eyebrows, and he made a similar mark between the eyebrows of each subject in the lineup. Because the backgrounds of the photographs were different colors, he printed the lineup in black and white. On May 2, 2012, he showed the lineup to Mr. Simpson at the district attorney's office. Mr. Simpson identified the Defendant as the third perpetrator and stated he was certain about his identification. He said this lineup was the only one he showed Mr. Simpson relative to the identification of the third suspect. He said Mr. Simpson had viewed other photograph lineups on May 22, 2011, relative to the other suspects. He said that Mr. Simpson was shown a lineup that did not include Mr. Epps, Mr. Snorten, or the Defendant, and that Mr. Simpson did not identify anyone from this lineup. Mr. Simpson identified Mr. Epps and Mr. Snorten, respectively, from two other photograph lineups. Detective Wall did not meet with Mr. Simpson in the summer or fall of 2011 and was unaware of any other law enforcement interaction with Mr. Simpson about the homicide.

Color and black and white copies of the photograph lineup containing the Defendant's photograph were received as exhibits. After receiving the proof, the trial court denied the motion to suppress.

The court considered the matter further, however, after Detective Wall discovered he had testified incorrectly about his having used a black and white lineup when Mr. Simpson identified the Defendant. A second hearing took place, at which Detective Wall testified that in preparation for the first hearing, he had requested a copy of the relevant

photograph lineup from the property room and had not requested the original. He said that although the property room had the capability to make color copies, he received a black and white copy. He had no independent recollection whether the lineup was shown to Mr. Simpson in color or black and white.

Detective Wall testified that he had shown Mr. Simpson a photograph lineup with Mr. Epps's photograph and had used a black and white copy because the backgrounds of the individual photographs were dissimilar. Relative to his previous testimony that he used a black and white lineup for the Defendant, he said he confused the Epps lineup with the lineup containing the Defendant's photograph.

Relative to the color lineup containing the Defendant's photograph, Detective Wall testified that the Defendant's cheek and neck tattoos were noticeable. He said he had not noticed the cheek and neck tattoos but had noticed the forehead tattoo when he viewed the Defendant's photograph on a computer. He thought that when Mr. Simpson was interviewed after the crime, the tattoos Mr. Simpson mentioned did not include the forehead tattoo because the Defendant had worn a hat.

Detective Wall testified that the tattoo parameter on the database he used to compile the lineup did not work when he tried to use it to create the lineup. He said he looked through hundreds of photographs and did not find any subjects with face and neck tattoos.

Metro Nashville Police Director of Information Technology Richard Vaughn testified that after learning an issue existed in this case relative to the functionality of the tattoo parameter, he used the software and determined that the tattoo parameter worked "very well." He said over 100 tattoo parameters existed but did not recall which ones he tested. He said that if someone searched for specific criteria using the database, the results depended on whether booking officers entered detailed information when adding photographs to the database. He acknowledged a search performed on the date of the hearing would have been better than a search performed a year earlier due to additional database input.

After receiving the additional proof, the trial court again denied the motion to suppress. The court found that the lineup was not impermissibly suggestive.

**Trial Evidence**

The trial evidence centered on the identification of the Defendant as one of the perpetrators of the robbery that culminated in the victim's death. The State did not contend that the Defendant shot the victim, and the evidence showed that Mr. Epps was the shooter.

Steven Simpson testified that he visited the victim on the night of the victim's death. He said the victim was unemployed and sold marijuana. He said that he sometimes smoked marijuana with the victim and that the victim sometimes used methamphetamine. He said, though, they had not yet begun smoking marijuana that evening. He said they played video games for about one hour before someone knocked on the door. He said the victim allowed three men into the house. Mr. Simpson said that one of the men was Joseph Snorten, an acquaintance, but that he did not know the other two. Regarding the person he later identified as the Defendant, Mr. Simpson said they were seated three to four feet apart. He described the person as having a dark complexion, bumps on his face, and tattoos on his arms, neck, and face. He said one of the neck or face tattoos looked like a diamond, a star, or a letter with a pointed shape. He said the person wore a baseball cap, a dark shirt, and shorts. The cap was pulled down and covered the person's eyebrows.

Mr. Simpson testified that a conversation ensued about marijuana and that the victim showed the three men a small amount. He said that the man identified as the Defendant asked to use the restroom and that when the man returned, he had a gun. He said that the hallway was dark and that he had not paid attention as the man came down the hallway. Mr. Simpson said the person identified as Mr. Epps had a gun, stood, and demanded drugs and money. He said the victim gave them money. Mr. Simpson told them he did not have any money. He said the men made him and the victim lie on the floor. He said that the men asked if anyone else was in the house, that the man identified as the Defendant started to walk to the back of the house, that the victim told them a friend was in a back room, and that he saw the person from the back room being brought into the living room. He heard gunshots. He said the three men fled the house. Mr. Simpson said that when the robbery began, the men said they would shoot Mr. Simpson and the victim if they caused problems. He said that he and the victim did not cause any problems during the robbery and that he did not expect the victim would be shot.

Mr. Simpson testified that he described the suspects to the police that night. He did not know names of the men who accompanied Mr. Snorten. Mr. Simpson said that due to the Defendant's complexion, he was unable to discern the details of the Defendant's facial tattoos. He agreed he told the police the person later identified as Mr. Epps was "much taller," around 6′, and heavyset. Mr. Simpson acknowledged that he had described the man later identified as the Defendant as short but explained he meant the man was shorter than Mr. Epps. He agreed he described the man as being 5′8″ or 5′9″. He acknowledged he told detectives five to thirty seconds passed between when the men entered the victim's house and when things "went nuts." He said, though, that five to ten minutes elapsed between the men's arrival and the beginning of the robbery. He said "a minute or so" passed between the man identified as the Defendant going down the hall toward the restroom and the beginning of the robbery.

Mr. Simpson testified that he was shown a series of photograph lineups, from which he identified Mr. Snorten, Mr. Epps, and the Defendant. He thought he was shown a lineup from which he did not identify a suspect. He acknowledged his identification of the Defendant occurred later after the crime than his identification of the other two suspects. He said he was certain of his identification of the Defendant and Epps. Relative to the first lineup Mr. Simpson viewed, which was the one from which he did not identify anyone, he said that one of the subjects resembled the suspect who was later identified as the Defendant, that he spent a long time viewing the lineup because he wanted to be sure, that he was instructed not to make an identification unless he was sure, and that he did not identify anyone. He said he did not feel pressured by the police to make an identification when he viewed the lineups.

Relative to his ability to see the man identified as the Defendant during the robbery, Mr. Simpson testified that he could see the man's eyebrows, that the man wore a baseball cap, and that he did not notice an obvious tattoo between the man's eyebrows. Mr. Simpson said the man went to the back of the house to get the person in the bedroom but conceded it was possible Mr. Snorten also went to the back. He said that when he was on the floor, he did not see Mr. Snorten and assumed Mr. Snorten remained seated on the couch.

Joseph Snorten testified that he was on probation for a felony during the time he was involved in the drug trade in 2010 and 2011 and that he was currently on probation. He acknowledged that when he was a juvenile, he was convicted in criminal court of two counts of robbery and said both counts involved one incident. He acknowledged an additional robbery conviction and a pending drug possession case. He said he was aware of his Fifth Amendment rights and was willing to testify due to his concern about his situation and because he wanted to make things right as best as he could. He said that he had pending homicide charges that had not been presented to the grand jury and that he was not in custody. He said that although he did not know what would happen with his pending homicide charges and probation violations, he hoped for a favorable outcome.

Mr. Snorten testified that he began buying marijuana for resale from the victim in 2010. He said he liked the victim and "hung out" with him a couple of times. He said theirs was an "important business relationship."

Mr. Snorten testified that he met the Defendant when they were incarcerated previously. He said that he knew the Defendant as Quez but that he also knew the Defendant's given name. He said he also knew Mr. Epps but did not know his given name. He said that in May 2011, the Defendant and Mr. Epps contacted him about buying "Dro," or high-grade marijuana. He said that he also negotiated with other buyers that day and that he planned to purchase marijuana from the victim. He said he, the

Defendant, and Mr. Epps went together in his fiancée's car to the victim's house to obtain marijuana. He said that on the way, the Defendant mentioned robbing the victim. He said he attempted to defuse the situation because he did not want to endanger his marijuana supply and because the victim knew too much personal information about him, including where his family lived. He said he went along with the plan because he thought he could control the situation and was concerned the Defendant and Mr. Epps would rob him of the $1300 he possessed if he did not cooperate. He did not think anyone would be physically harmed.

Mr. Snorten testified that when they arrived, he had a bad feeling it would not go well. He said that he wanted to turn around in the cul-de-sac near the victim's house and leave but that Mr. Epps stated he had not come all the way to the victim's house to leave empty-handed.

Mr. Snorten testified that when the robbery began, the Defendant told him to determine if anyone was in the back bedroom. He said he found a man in the room and held him at gunpoint. He said that the victim and "another white guy" were lying on the living room floor. He said he ran out of the back bedroom when he heard a gunshot and ran to the car. He said that when the Defendant and Mr. Epps reached the car, he drove away. He said they went to a hotel and slept until the next day. He said that the morning after the crime, they discussed their remorse over what happened. He did not know if the Defendant and Mr. Epps received anything in the robbery and said he did not receive any proceeds.

Mr. Snorten testified that he consulted with an attorney and turned himself in about six days after the crime because he learned that the police were looking for him and that an arrest warrant had been issued. He acknowledged he tried to protect himself and told the police things that were untrue. He said he was concerned about threats to his family, his probation violations, what the victim's associates would think, and what the Defendant and Mr. Epps would think.

Relative to the robbery, Mr. Snorten testified that he falsely told the police he did not know what was going to happen. He also acknowledged he falsely told the police he left the victim's house alone. He said that in his statement to the police, he identified the men with him on the night of the crime as "G-Quez" and "Goldie" and described them, including the Defendant's tattoos. He said that he falsely told the police he did not know G-Quez's given name and that despite his initial failure to identify the Defendant as a participant in the robbery, he had always known the Defendant's name and identity. He told them he knew G-Quez's brother. He said that he falsely told the police he sat on the couch during the robbery and that he failed to reveal he had gone into the bedroom and held someone at gunpoint. He said that he tried to provide the police with enough

information to appear cooperative but that he hoped the Defendant would not get "jammed up."

Mr. Snorten testified that he "got caught up in the street life" when he sold drugs. He said he felt badly about the events of this case. He said that at the time of the trial, he had a moving business and a small child. He acknowledged he participated in a robbery in which someone was killed but said he was not guilty of felony murder. He said he felt forced to participate in the robbery.

A police evidence technician testified that she could smell marijuana outside the victim's house when she arrived to process the scene. A police officer with previous experience as a narcotics officer testified that he smelled a strong marijuana odor outside the victim's house which became stronger inside. He said that it was difficult to determine if the smell was from recently burned marijuana. He said that in his experience, a home from which marijuana was sold usually had a marijuana odor. Another police officer testified that he smelled a strong marijuana odor when he walked into the victim's house on the night of the offense. He said the doors were open and other officers and medical personnel were already at the scene.

Dr. Feng Li, an expert in forensic pathology, testified that he performed the victim's autopsy. He said the victim died of an intermediate range gunshot wound to the left side of the back. He said the victim's blood tested positive for amphetamine, methamphetamine, marijuana, and marijuana metabolites. He could not say whether the methamphetamine level in the victim's blood was high and said that although the effect varied by individual, the amount in the victim's blood could cause a person to be violent and irrational. He said he could not state an opinion about the effect of marijuana on a specific person without knowing the person's history.

The parties stipulated that the victim's blood sample tested positive for the compound substance methamphetamine. They stipulated that testing was not performed to determine the relative concentration of I and D isomers and that D isomer could cause hallucinations, aggression, and irrational reactions. They stipulated that the Defendant's compound methamphetamine level was 410 nanograms per milliliter and that violent and aggressive behavior had been reported at 200 to 600 nanograms per milliter.

Detective Corey Wall testified that the police identified Mr. Snorten as a "person of interest" based upon a cell phone they found at the scene. He said that within hours of the crime, Mr. Simpson described the suspect later identified as the Defendant as being 5′8″ to 5′9″, having shoulder-length dreadlocks, having darker skin than the heavyset suspect, having tattoos on his neck and arms, and having bumps on his face.

He said that after the police obtained an arrest warrant for Mr. Snorten a few days after the crime, Mr. Snorten surrendered himself. Detective Wall interviewed Mr. Snorten in the presence of Mr. Snorten's attorney on June 1, 2011. He said that when he spoke with Mr. Snorten's attorney, the attorney identified one of the individuals involved as "Quels" or "Qualls." He said, though, that Mr. Snorten told him the person's nickname was G-Quez. Detective Wall said that by the time he met with Mr. Snorten on June 1, he had received information from other sources about the identity of the heavyset man and that Mr. Snorten identified Mr. Epps from a photograph lineup Detective Wall prepared based upon the information.

Regarding Mr. Snorten's statements, Detective Wall testified that although Mr. Snorten minimized his own involvement in the robbery and homicide, Mr. Snorten never identified suspects other than the men he initially identified as G-Quez and Goldie. He said Mr. Snorten never described a robbery scenario in which the person later identified as the Defendant was not involved.

Detective Wall testified that he attempted to identify the person Mr. Snorten referred to as G-Quez based upon the nickname and other information Mr. Snorten provided. He said he searched the police department's computer database for the nickname but had too many results to narrow the search meaningfully.

Detective Wall testified that he met with Mr. Snorten in late April 2012 and that Mr. Snorten revealed the third robbery participant's nickname was "Quez." Based upon this information, Detective Wall searched the police database and identified the Defendant as a suspect. He showed Mr. Snorten a photo of the Defendant, which Mr. Snorten confirmed depicted the third participant.

Regarding his searching the database in 2012, Detective Wall testified that although the database had information about the height of the individuals whose photographs were stored in it, he could not recall what Mr. Simpson said about the third participant's height when he searched the database. He agreed that Mr. Simpson had described the third participant's tattoos in vague terms. He said that the Defendant's photograph from the database was consistent with Mr. Simpson's description and that none of the other photographs used in the lineup had tattoos that matched Mr. Simpson's description. He said he attempted to use the database's tattoo parameter, but the software returned no results. Although he did not recall how many photographs he viewed to compile the lineup, he said he generally tried to review "hundreds." He did not notice anything potentially unfair relative to the Defendant's photograph in the lineup. He said that the photographs he used had three different backgrounds and that he had used photographs with different backgrounds to avoid emphasizing any one photograph with a different background. He said that he noticed a forehead tattoo in the Defendant's photograph and that he drew a dot on the location on each of the photographs he used in

the lineup in order to prevent the tattoo from being a consideration when the lineup was shown to a witness. He said that on May 2, 2012, Mr. Simpson identified the Defendant from the lineup and that he did not ask Mr. Simpson to quantify his degree of confidence in the identification.

Detective Wall testified that he had always operated with the information that Mr. Snorten was a bystander to the robbery and homicide. He said he would have been aware had Mr. Snorten reported having a gun at the crime scene, knowing the plan, and participating by holding the person in the bedroom at gunpoint.

Jeffrey Neuschatz, Ph.D., an expert in eyewitness identification and memory, testified that memory was fluid and constantly changing each time a person recounted an event. He said memory could change dramatically and that a person edited their memory in order to maintain consistency. He said memory could be affected by questions a person was asked about an event. He said stress, short exposure time to events, divided attention, and long retention intervals could affect memory.

Relative to the effect on memory in the presence of a weapon, Dr. Neuschatz testified that a person tended to focus on the weapon and remember it, rather than other details, particularly details related to the person holding the weapon. Dr. Neuschatz agreed that one study had shown a 95% accuracy rate in identifications made after forty-five seconds of exposure to the subject. He agreed that because Mr. Simpson saw the perpetrators for a period of time before the robbery began, Mr. Simpson's identification of the Defendant could be more accurate than if a weapon had been introduced immediately. Dr. Neuschatz was unaware of any research regarding a witness's prior familiarity with weapons affecting the rate at which weapon focus impaired memory. He thought it was possible the presence of a gun would cause less memory impairment in a witness who was familiar with guns.

Dr. Neuschatz testified that research had shown the accuracy of cross-race identifications was lower than same-race identifications. He said people had difficulty knowing the facial features of races other than their own. He agreed that a witness's ability to identify persons of another race increased with exposure to individuals of the other race. He also said that some studies had shown impairment in memory "encoding" following alcohol or marijuana consumption.

Dr. Neuschatz testified that the "commitment effect" referred to the likelihood of a witness's choosing a person from a lineup after having previously viewed the person's photograph in a "mug book." He said that a witness who had not chosen a suspect from a mug book was unlikely to identify anyone, including the perpetrator in a subsequent lineup. Dr. Neuschatz said that in-court identifications were problematic because the

witness would have seen the suspect previously in a lineup and because only one suspect was present in court.

Dr. Neuschatz testified that a well-constructed photograph lineup provided an equal chance of any of the six subjects being chosen based upon the original description. He said that ideally lineup photographs should be chosen based upon their consistency with the description, rather than by matching additional photographs to the photograph of the suspect. Relative to descriptions such as facial tattoos, he said that such markings should appear in all of the photographs or none of them and that the use of only one photograph of a person with tattoos should be avoided.

Dr. Neuschatz testified that four factors should be present in a good lineup procedure: (1) unbiased instructions to the witness relative to viewing the lineup and making an identification, (2) use of a double-blind procedure whereby the law enforcement officer showing the lineup to the witness is unaware of which subject in the lineup is the suspect, (3) the witness's making a confidence statement immediately after making an identification, and (4) the suspect's not standing out in the lineup based upon the witness's description.

Dr. Neuschatz testified that in his opinion, the lineup from which Mr. Simpson identified the Defendant was unfair. He noted that the Defendant's facial tattoo was obscured in the lineup but that the Defendant's neck tattoos were not. He acknowledged that some of the procedures employed relative to the lineup from which the Defendant was identified were good practices.

Dr. Neuschatz testified that according to university studies, a witness was more likely to choose the suspect if the person conducting the lineup procedure knew the suspect's identity. He said this occurred even if the person conducting the lineup asked after a witness identified the suspect if the person had given the witness any indication of the suspect's identity. He agreed that through an unexplained phenomenon, the person conducting the lineup communicated the suspect's identity to the witness. He agreed that if a witness were aware that a bad consequence will occur if an incorrect identification was made, the witness was more likely, if making a selection, to make a correct identification.

After receiving the proof, the jury found the Defendant not guilty of first degree premeditated murder in Count 1 but found him guilty of the lesser included offense of second degree murder. In Count 2, the jury found the Defendant guilty of felony murder in the perpetration or attempt to perpetrate robbery. In Count 3, the jury found the Defendant guilty of employing a firearm during the commission of or attempt to commit a dangerous felony. The trial court merged the homicide convictions and dismissed the

firearms charge, and it imposed a life sentence.  After the court denied the Defendant's motion for a new trial, this appeal followed.

# I

## Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress Mr. Simpson's identification of him from a photograph lineup.  He argues that the lineup procedure was suggestive and unreliable.  The State contends that the court did not err in denying the motion to suppress.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them.  *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990).  Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  *Odom*, 928 S.W.2d at 23.  The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence."  *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).  A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal.  *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).  In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing.  *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Supreme Court has recognized that although perils exist in identifying suspects through use of photograph lineups, identification from photographs can be an effective method "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  As the *Simmons* court recognized, potential for misidentification increases when a photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."  *Id*. at 383.  The *Simmons* court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Id*. at 384; *see Sloan v. State*, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978).  "[A] photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken

identification that [the accused] was denied due process of law.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

The relevant guidelines for assessing whether evidence of an identification from a photograph lineup is admissible were announced in *Neil v. Biggers*, 409 U.S. 188 (1972). The *Biggers* two-part analysis requires, first, that the trial court determine whether the identification procedure was unduly suggestive. *Id.* at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998); *see Simmons*, 390 U.S. at 383. If the identification procedure was unduly suggestive, the second question is whether the identification was reliable despite the undue suggestion. *Biggers*, 409 U.S. at 198-99. The *Biggers* majority identified five factors to be considered in making that determination:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. If, upon consideration of the *Biggers* factors, the court determines that the identification procedure was so unduly suggestive that it violated the defendant's due process rights, evidence of the identification must be excluded. *State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

The Defendant argues that the lineup was unduly suggestive because he was the only person with neck and cheek tattoos as described by Mr. Simpson, that Detective Walls obscured the facial tattoo which was not described by Mr. Simpson, and that nothing was done to obscure the "bright yellow" background of the Defendant's photograph. Relative to the reliability of the lineup in the face of its alleged undue suggestiveness, the Defendant argues that the identification took place almost one year after the crime, that the proof suggests Mr. Simpson was impaired at the time he viewed the perpetrators; that the accuracy of Mr. Simpson's memory is questionable due to weapon focus, extreme stress, cross-race identification, and divided attention; that a double-blind procedure was not used in which the officer administering the lineup was unaware of the suspect; that photographs were chosen by the "match to description" method; and that no immediate confidence statement was taken after Mr. Simpson made the identification.

In denying the motion to suppress, the trial court found the following relative to the issues raised at the suppression hearing, which were limited to the selection of the lineup photographs:

- 13 -

In this case, Defendant argues that that photo line-up was impermissibly suggestive because the photo of Mr. Sails is the only one where a tattoo is displayed on his neck area and because of the distinct background in his photo. A view of the photo line-up does show a tattoo on Mr. Sails' neck partially exposed above his shirt. However, the tattoo is not distinct or prominent such that a viewer's observations would be unduly drawn to it to the exclusion of the photos as a whole. In fact, the drawn dot in the center of each subject's forehead tends to draw one's attention to the center of their faces rather than the neck area.

In viewing the background of the photos, the court notes that the background of Mr. Sails [in photograph number 3] is similar to photo #1 and distinct from the other four (4). However, there are clear distinctions in the background of three (3) of the four (4) remaining pictures with numbers 4 and 5 looking similar, but distinct from numbers 2 and 6, which are also distinct from each other. Clearly, the multiple background variances does not attract a viewer's attention to any one photo.

Although Mr. Simpson did not initially describe Mr. Sails as having facial hair, Det. Wall was careful to include facial hair on all subjects since the available photo of Mr. Sails had facial hair. Notwithstanding the distinctions noted by Defendant, the court does not find that the photo line-up is impermissibly suggestive.

Because the court determined the lineup was not unduly suggestive, it did not conduct an analysis of the *Biggers* factors to determine whether the identification was reliable despite an unduly suggestive lineup. *See Biggers*, 409 U.S. at 198-99.

We have reviewed the original lineup from which Mr. Simpson made his identification. As the trial court noted, every subject has a dot over the portion of their foreheads that corresponds with the location of the Defendant's forehead tattoo. The photographs are not high resolution, and although the Defendant is the only person with cheek and neck tattoos, none are distinctive. The cheek tattoos are faint, follow the contours of the Defendant's cheekbones, and could be mistaken as shadows. The neck tattoo could be mistaken as hair or a shadow, and upon closer inspection, it is largely obscured by the Defendant's clothing. The clothing worn by some of the other subjects is such that it could obscure tattoos in the same area. All of the subjects appear to be of the same approximate age, have their hair in dreadlocks, and have facial hair. No subject is distinctively attired. Although the background of the Defendant's photograph and that of another subject appear more yellow, two others appear more tan, and two others appear more gray. The background color does not draw attention to the Defendant's photograph.

- 14 -

We conclude the trial court properly ruled that the lineup was not unduly suggestive and was not subject to suppression. Because the lineup was not unduly suggestive, consideration of the *Biggers* factors is not required. The Defendant is not entitled to relief on this basis.

## II

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support the conviction. He argues that if the lineup identification had been suppressed, the testimony of Mr. Snorten, because he was an accomplice, would have been insufficient to support the conviction. The Defendant has not argued that the State failed to prove the commission of the offense, nor has he argued that the evidence actually presented at the trial was insufficient to support the conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (*quoting State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2014). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a) (2014). "Second degree murder is . . . [a] knowing killing of another[.]" *Id.*, § 39-13-210(a)(1) (2014).

As we stated in Section I above, the trial court properly denied the motion to suppress. Relative to the Defendant's claim that the evidence is insufficient without the photograph lineup identification evidence, we note the following:

> Whether the evidence at trial is legally sufficient to support the verdict is examined in light of the evidence actually presented to the jury. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981), *overruled in part on other grounds by State v. Leveye*, 796 S.W.2d 948, 953 (Tenn. 1990). Evidence that a defendant maintains was improperly admitted does not implicate the State's failure or success in proving its case. The remedy for the erroneous admission of prejudicially harmful evidence, therefore, is reversal for trial error, not dismissal of the charge. *See Longstreet*, 619 S.W.2d at 100-01; *State v. William Binkley*, No. M2001-00404-CCA-R3-CD, slip op. at 4-5 (Tenn .Crim. App., Nashville, Apr. 5, 2002).

*State v. Richard Perkinson*, No. E2008-01180-CCA-MR3-CD, 2009 WL 856339, at *8 (Tenn. Crim. App. Mar. 26, 2009). We will consider the sufficiency of the evidence admitted at the trial.

In the light most favorable to the State, the evidence shows that the Defendant, Mr. Snorten, and Mr. Epps went to the victim's house, and after visiting with the victim and Mr. Simpson, they perpetrated a robbery. The Defendant participated in the crime by displaying a weapon and holding a third occupant of the house at gunpoint. Mr. Epps fatally shot the victim during the perpetration of the robbery. The Defendant fled with Mr. Snorten and Mr. Epps. Mr. Snorten identified the Defendant as one of his accomplices, and Mr. Simpson identified the Defendant as one of the perpetrators.

The evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

### III

### Misidentification of Defense Counsel

The Defendant contends that the trial court erred in excluding evidence of Mr. Simpson's confidence in his misidentification of defense counsel. The Defendant argues that he should have been allowed to cross-examine Mr. Simpson about Mr. Simpson's confidence despite his misidentification of defense counsel as the defense investigator. The Defendant sought to cross-examine Mr. Simpson in this regard in order to impeach Mr. Simpson's credibility related to his confidence in his identification of the Defendant. The State contends that Mr. Simpson's alleged misidentification of defense counsel was

not relevant to the accuracy of Mr. Simpson's identification of the Defendant as one of the perpetrators of the offense.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The Defendant filed a pretrial motion in limine relative to this evidence. In the motion, counsel alleged that following an earlier hearing, Mr. Simpson approached defense counsel and stated he "did not appreciate [counsel's] coming to [Mr. Simpson's] house and pretending to be a private investigator." Counsel alleged that when he told Mr. Simpson the person had been the defense investigator, not counsel, Mr. Simpson stated, "No, that was you!"

In denying the Defendant's motion in limine, the trial court stated:

The law provides that [when] you evaluate the reliability of the eyewitness testimony one of the factors is [to] consider other occasions when they have either identified that same person or failed to identify that same person.

. . . .

Not some other person, that's the problem I'm having, it's an obvious argument, I can definitely understand what you're trying to accomplish, I just -- I don't know that it's relevant because that's not – the reliability of the identification is based on the identification of that individual, not what he may or may [not] have done with other individuals. . . .

[I]n the absence of [Dr. Neuschatz' testifying that Mr. Simpson's confidence in identifying defense counsel and Mr. Simpson's confidence in identifying the Defendant are related], I just don't see that it provides any insight to the jury, which is what relevance is all about.

The Defendant has cited no case law to support his assertion that the evidence was relevant and admissible pursuant to Tennessee Rule of Evidence 401. Upon review, we conclude that the trial court did not abuse its discretion in determining that the evidence

of Mr. Simpson's misidentification of defense counsel was not relevant to impeaching Mr. Simpson's confidence in his identification of the Defendant as one of the perpetrators. We believe, as well, that admission of the evidence, to the extent the Defendant argues that it is relevant, was substantially outweighed by the danger of confusing the issues and misleading the jurors and was properly excluded. *See* Tenn. R. Evid. 403. The Defendant is not entitled to relief on this basis.

## IV

### Admission of Evidence of Gang Affiliation

The Defendant contends that the trial court erred in prohibiting cross-examination regarding Mr. Snorten's gang affiliation. The State contends that the trial court did not abuse its discretion. We agree with the State.

The Defendant also filed a pretrial motion in limine seeking to exclude evidence of his own gang affiliation, which the trial court granted. The Defendant then filed a pretrial motion in limine seeking permission to cross-examine Mr. Snorten about Mr. Snorten's criminal history. The motion did not mention Mr. Snorten's gang affiliation. At a subsequent hearing, the parties sought rulings on evidentiary matters they had been unable to resolve. The prosecutor stated that the parties had been unable to agree on the admissibility of some of Mr. Snorten's prior convictions and that defense counsel sought admission of evidence of Mr. Snorten's gang affiliation. The prosecutor argued that the gang affiliation evidence was not probative but that if the court admitted evidence of Mr. Snorten's gang affiliation, it should also permit the State to elicit testimony from Mr. Snorten that the Defendant was affiliated with the same gang.[1] The court determined that the evidence was irrelevant, that any arguable relevance was substantially outweighed by the danger of unfair prejudice, and that the evidence would be excluded. The court reasoned:

> We're going to stay away from it. I think it's dangerous because I think it opens the door potentially for [the Defendant] to be exposed as a gang member, and that's obviously so prejudicial that there's no way to correct that, and to give a limiting instruction that in my mind would keep the jury on track, I mean, if you bring in this unknown third [suspect] and he's a gang member, then [the] State's going to be able – they are going to have to be allowed to put on evidence that that unknown one happens to be

---

[1] The transcript of the motion for a new trial hearing reflects that the prosecutor initially stated that the Defendant and Mr. Snorten were members of the same gang. After the Defendant became upset, the prosecutor noted the error and stated that the Defendant was a member of a different gang and that Mr. Epps was also a member of the Defendant's gang.

your guy who has the same nickname and that he is an admitted gang member to show that this third phantom person that you're talking about doesn't even really exist. And I just think that that's – because if you open the door, the State gets to respond to it, and that's the problem I see with it and I'm always particularly sensitive unless the criminal act has something to do with gang membership, I'm always very reluctant to allow gang activity getting involved because I think in the long run the jury just forgets everything else and says, "Get this person off the street. If he's a gang member, I don't care whether he was involved or not, he's been involved in other things and we need to take care of it now." And I just think that whatever probative value it may have is significantly outweighed by the prejudicial effect that it could have on [the Defendant.]

At the hearing on the motion for a new trial, the court further explained its rationale: "I . . . saw that it was misleading to the jury to suggest that one of them was a gang member and the other wasn't, . . . and to allow an argument that is contrary to what everybody knew to be the reality just seems . . . unfair[.]"

The Defendant argues that Tennessee Rule of Evidence 616 provides broad authorization for cross-examination of a witness for impeachment purposes, including a witness's bias. He argues that Rule 616, which permits "evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor or prejudiced against a party or another witness," reaches far beyond the limits of admissible evidence relative to a non-testifying defendant. In his view, the evidence of Mr. Snorten's gang affiliation was relevant to show Mr. Snorten's motive to lie to inculpate the Defendant, rather than a fellow gang member who was the true third participant in the crime. The Defendant also argues that Mr. Snorten's gang affiliation was relevant to show his bias in favor of helping the State obtain a conviction in order to avoid incarceration relative to his own charges.

Had the Defendant been allowed to ask Mr. Snorten about his gang affiliation as an attempt to show that Mr. Snorten falsely accused the Defendant of being one of his accomplices, the question of whether the Defendant was a member the same gang or a rival gang would have become relevant and could have been elicited from Mr. Snorten, even if the Defendant did not testify. As the trial court noted, evidence of the Defendant's gang membership would have had a highly prejudicial effect on the Defendant. On the other hand, permitting cross-examination of Mr. Snorten about his own gang affiliation but prohibiting questioning about the Defendant's gang affiliation would have misled the jury because it would have suggested falsely that the Defendant was not a gang member. We conclude that the trial court did not abuse its discretion in prohibiting the Defendant from cross-examining Mr. Snorten about his gang affiliation.

- 19 -

**V**

**Evidence of Software Used to Generate Photograph Lineup**

The Defendant contends that the trial court erred in excluding Mr. Vaughn's testimony at the trial regarding the "workings and capabilities" of the software used to generate the photograph lineup. The Defendant argues that Mr. Vaughn should have been allowed to testify at the trial, as he did at the suppression hearing, that the software's tattoo parameter worked "very well" and that he had never received a complaint about it. The Defendant posits that this evidence would have impeached Detective Wall's testimony that the tattoo parameter did not work when he attempted to use it and that including other tattooed subjects in the lineup was "impossible or impracticable."

The State responds that the issue to be determined was not whether Detective Wall might have constructed the lineup differently, rather, it was whether the lineup he used was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. The State argues that this issue was properly decided by the trial court following a suppression hearing and that had Mr. Vaughn's testimony been permitted at the trial, it would have been irrelevant and would have distracted the jury from the issues to be considered.

Upon consideration, we agree with the State. To the extent the evidence was relevant, it was properly considered by the trial court in determining whether the lineup identification was admissible, and the court considered the evidence for this purpose in denying the motion to suppress. At the trial, the identification issue before the jury was whether Mr. Simpson accurately identified the Defendant as one of the perpetrators. The jury had the lineup before it as an exhibit and heard Detective Wall's testimony about how he compiled the lineup. He said that he attempted to use the software's tattoo parameters but that it did not return any results. The details of whether the software worked when Mr. Vaughn tested it, which we note was after Detective Wall generated the lineup, was irrelevant. The court admitted relevant evidence via Dr. Neuschatz' expert testimony about the composition of the lineup and the administration of the identification procedure. The court did not abuse its discretion in excluding Mr. Vaughn's testimony. The Defendant is not entitled to relief on this basis.

**VI**

**Expert Testimony About the Suggestive Nature of the Photograph Lineup**

The Defendant contends that the trial court erred in excluding Dr. Neuchatz' opinion testimony regarding whether the photograph lineup was impermissibly suggestive. The court excluded the evidence on the basis it addressed the "ultimate

issue." The State counters that although the court erred in sustaining its objection to the evidence, the error was harmless because Dr. Neuschatz' opinion on the issue was presented to the jury through other portions of his testimony.

The following occurred during direct examination:

Q. [W]hat's your analysis on this particular lineup?

A. My analysis is that the description, as I remember it was, with the person who committed the crime was dark-skinned, he had dreadlocks down to about his ears and that he had tattoos on his arms and on his face, and based on that, it seems to me, as I look at the lineup, there's only one person that appears to have tattoos around his neck and on the side of his face. The other people have a black dot, which I assume covers a tattoo.

Q. Are there any other circumstances about this lineup that you find unusual or interesting?

A. I don't, no.

Q. What is your opinion of the quality of this lineup in terms of its ability to produce reliable? [sic]

A. I think it's problematic that the suspect is the only one that has tattoos around his neck and on his face.

Q. Do you think that this is a fair lineup?

A. I do not.

Q. Do you think that this is the kind of lineup that you were talking about when you said that a biased lineup or an unreliable lineup is one in which someone who didn't witness the occasion, or but when is simply read the description can easily pick out who the target suspect is?

A. I mean, I do. I'm confused, clearly the police officer knew that the proper thing to do was to cover up the tattoo since there's a black mark on all of them, I'm unclear why they didn't just do that for all the tattoos.

Q. And in your opinion is the failure to do that, does that make the lineup worse?

A.   Yes.

During redirect examination, defense counsel asked Dr. Neuschatz, "In your opinion, was the lineup in this case a biased lineup?" Dr. Neuschatz replied, "Yes." The prosecutor objected, stating, "You Honor, I guess I'd object to ultimate issue," and the trial court sustained the objection without further elaboration and without instructing the jury to disregard Dr. Neuschatz' answer.

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704. The State has not advanced any theory upon which the evidence was not otherwise admissible, and none appears. As the State correctly concedes, the trial court erred in sustaining the objection. *See, e.g.*, *State v. Shuck*, 953 S.W.2d 662, 668-69 (Tenn. 1997) ("[E]xpert testimony otherwise admissible is not subject to exclusion solely because it embraces an ultimate issue of fact to be decided by the jury.").

That said, though, we are unpersuaded that the Defendant was harmed by the court's erroneous ruling regarding the admissibility of the question about whether the lineup was biased. Dr. Neuschatz had already testified that in his opinion, the lineup was unfair. He also detailed his assessment of the shortcomings in the lineup compilation and identification procedures. When defense counsel asked the question on redirect, Dr. Neuschatz answered before the State's objection, and although the court sustained the objection, it did not instruct the jury to disregard Dr. Neuchatz' answer. The evidence was before the jury, and the erroneous ruling was harmless. The Defendant is not entitled to relief on this basis.

## VII

### Mistrial – Evidence of the Defendant's Previous Incarceration

The Defendant contends that the trial court erred in failing to grant a mistrial when Mr. Snorten testified that he knew the Defendant from their previous incarceration together. The State has not addressed this issue.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); see State v. Jones, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

- 22 -

The Defendant filed a pretrial motion to exclude his prior criminal record, and the trial court granted the motion without opposition from the State. During Mr. Snorten's direct examination, the prosecutor asked, "How long had you known both of those men [Goldie and Quez] and how did you know them?" Mr. Snorten stated, "I met Quez while we was incarcerated and I had been knowing Goldie approximately –," at which point defense counsel interrupted and asked to approach the bench, although counsel did not explicitly state an objection or request a mistrial. At the bench conference, the prosecutor stated that he had not anticipated Mr. Snorten's response. He said he had cautioned Mr. Snorten not to talk about prior criminal history and prior arrests. The court suggested that the prosecutor could ask if Mr. Snorten knew the Defendant after Mr. Snorten was released from jail and expressed its concern that if Mr. Snorten were asked an open-ended question, he might mention gang membership. The Defendant did not object to questioning of this nature, and the prosecutor asked, "Mr. Snorten, so, you were incarcerated, and what I heard you sayings [sic] is that you knew or – Mr. Snorten, you knew Mr. Sails after you got out of jail, right?" Mr. Snorten responded affirmatively. In the amended motion for a new trial, the Defendant sought relief based upon Mr. Snorten's testimony about the prior incarceration.

In his cursory argument, the Defendant argues that he was "impermissibly prejudiced" by the trial court's failure to grant a mistrial and that he was deprived of a fair trial. The Defendant has not explained, however, how the prejudice from the improper testimony was so great that a mistrial was the only feasible alternative. Upon review, we are unpersuaded that manifest necessity existed for the court to have declared a mistrial. The mention of the Defendant's previous incarceration was isolated. It was unanticipated by the State, and the court took corrective action to have the prosecutor redirect the witness by asking a question that mentioned Mr. Snorten's but not the Defendant's incarceration. Although no curative instruction was given, none was requested. As the court noted, the overriding concern was avoiding Mr. Snorten's mentioning he knew the Defendant due to the Defendant's gang affiliation. The court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

# VIII

## Improper Closing Arguments

The Defendant contends that the State engaged in prosecutorial misconduct during closing argument regarding Dr. Neuschatz' testimony about the difficulties of cross-racial identification. The Defendant argues that the State mischaracterized the research "as essentially asserting a claim of racism." The Defendant also contends that the State injected the prosecutors' personal beliefs in the Defendant's guilt by challenging the Defendant's contention that Mr. Snorten's testimony was influenced by his desire to

provide testimony to help the State in order to improve Mr. Snorten's situation relative to his pending charges.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

> Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.


## A. **Cross-Racial Identification**

During the State's first argument, one of the prosecutors reviewed the components of Dr. Neuschatz' testimony in detail, including the effects of exposure time, weapon focus, Mr. Snorten's failure to mention the suspect's forehead tattoo, stress, retention interval, and the lineup procedures. Relative to Dr. Neuschatz' testimony about cross-racial identification, the prosecutor stated:

> Own race bias is a difficult topic. It's something that's out there in the identification literature, and the most pernicious part about it is it plays to our sort of basic instincts, that we have difficulty in this day [and] age in distinguishing people who don't look like us, you know, and that may be true, but ladies and gentlemen it's not always true and you have a lot of evidence that it wasn't true in this case. I don't think it would be just to decide that Steven Simpson couldn't identify Varquez Sails because white people think all black people look alike. If that is meaningful to you, we will respectfully disagree, but I submit that you have a lot of other evidence that doesn't even really get to that point.

The State argues that the Defendant waived any objection to this argument by failing to make a contemporaneous objection, and that in any event, the argument was not prosecutorial misconduct. We agree that the Defendant failed to make a contemporaneous objection. Our review is limited to consideration of whether plain error exists. *See, e.g.*, *State v. Fusco*, 404 S.W.3d 504, 519 (Tenn. Crim. App. 2012) (stating

- 25 -

that a prosecutorial misconduct issue was waived due to the absence of a contemporaneous objection and that the appellate court was limited to consideration of plain error); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997) (stating that an issue of prosecutorial misconduct was waived by the defendant's failure to make a contemporaneous objection).

We will consider whether the prosecutor's argument amounted to plain error. Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id*.; *Adkisson*, 899 S.W.2d at 642.

In that regard, we conclude that no clear and unequivocal rule of law was breached, that no substantial right of the accused was adversely affected, and that consideration of the issue is not necessary to do substantial justice. Read in context, the argument may have oversimplified Dr. Neuchatz' testimony, but it falls short of fulfilling the Defendant's allegation of having reduced the cross-race identification research to being based in racism. The prosecutor's argument on this point was brief and was part of an inventory of several components of Dr. Neuschatz' testimony. No plain error exists. The Defendant is not entitled to relief on this basis.

## B. **Prosecutors' Belief in the Defendant's Guilt**

The Defendant's contention that one of the prosecutors improperly commented on his and the other prosecutor's personal belief in the Defendant's guilt is based upon the following argument:

> There was this sort of dirty inference that gets raised, "Mr. Snorten, you gave these attorneys what they wanted," the inference being that Mr. Snorten is sort of [a] marionette, a puppet that we can make dance for

something and me and Ms. Shabayek want to see happen; that's the sort of dirty inference, that we are somehow complicit, the State of Tennessee is complicit in Mr. Snorten's activities, that he is dancing to the tune that we are calling, which assumes . . . one of two things, we're either calling the tune because we don't care; or we're calling the tune because not only were Ms. Shabayek and I born on a Tuesday, but it was last Tuesday.

The Defendant objected at this point in the argument, and the trial court overruled the objection. The prosecutor followed the court's ruling by arguing, "The inference gets raised that Mr. Snorten is giving us what we want; you can decide if you think that's fair, based on how everyone's conducted themselves in this trial, it was an inference raised, and I object to it then and now." The prosecutor continued by arguing that the jury should consider all of the evidence in determining whether to believe Mr. Snorten's testimony. He noted specific aspects of the proof that he argued supported Mr. Snorten's credibility.

We have reviewed, in the context of the overall argument, the argument of which the Defendant complains. We have also reviewed it in light of the vigorous cross-examination the defense conducted of Mr. Snorten. Defense counsel asked if Mr. Snorten was "desperate to give [the State] the conviction that they are looking for," whether he "gave them exactly what they wanted" when he identified Mr. Epps from a photograph lineup, and whether he was "terrified of what the law could do" to him. Viewed in this context, we do not believe the State's closing argument contained any impermissible statements of the prosecutors' personal belief in the Defendant's guilt. Because no prosecutorial misconduct occurred, the Defendant is not entitled to relief on this basis.

## IX

### Violation of *Brady v. Maryland*

The Defendant contends that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by delaying disclosure that Detective Wall's initial search of the police database for persons with the nickname Quez returned too many results to provide any meaningful investigative leads. The Defendant also contends that the State violated *Brady* by delaying disclosure of Mr. Snorten's inconsistent statements. The State contends that the Defendant has waived our consideration by failing to provide appropriate citations to the record relative to the issue. The State also argues that no *Brady* violations occurred.

We begin with the State's waiver argument. The State is correct that the Defendant's brief is deficient because it fails to provide appropriate citations to the record to support his argument. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires

- 27 -

that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on." The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" Tenn. Ct. Crim. App. R. 10(b). Notwithstanding the deficiency in the Defendant's brief, we will consider the issue. We caution counsel, however, that appellate review is frustrated by the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56–57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

## A. Failure to Disclose Database Search

The Defendant contends that he was prejudiced by the State's tardy disclosure of Detective Wall's search of the police database for persons with the nickname Quez because the Defendant was deprived of the opportunity to use this information in litigating the motion to suppress, in his trial strategy, and in his opening statement. He argues, that this was a "vital piece of information," but he has not explained how his pursuit of the motion to suppress, trial strategy, or opening statement would have been affected by pretrial disclosure of the information.

Upon review of the record, we note the absence of a general *Brady* request for pretrial disclosure of information. The only *Brady* request in the record dealt with a specific request for Nicholas Watson's recorded statement. We note the evidence that Mr. Snorten initially gave Detective Wall the nickname G-Quez, that Detective Wall performed his initial database search with this information, and that Mr. Snorten did not

reveal the nickname Quez until nearly a year later, at which time Detective Wall was able to identify the Defendant as a suspect. We are unpersuaded of any obvious exculpatory, favorable, or material value of the information that Detective Wall's initial search of the database returned results that failed to narrow the field of possible suspects in any meaningful manner. No *Brady* disclosure was required, and the Defendant is not entitled to relief on this basis.

### B. <u>Failure to Disclose Mr. Snorten's Inconsistent Statements</u>

The Defendant contends that the State violated *Brady* by failing to make a pretrial disclosure about Mr. Snorten's inconsistent statements relative to the crime. The Defendant argues, without citation to the record, that "it became clear" during Mr. Snorten's testimony that Mr. Snorten gave "at least one inconsistent intermediate statement" in Spring 2012 and that the Defendant was unaware of the statement before the trial. The State acknowledges that Mr. Snorten gave different accounts of the crime. It argues, however, that the information is neither material nor exculpatory because Mr. Snorten's accounts varied as to the extent of his participation in the crime but were consistent relative to the Defendant's involvement.

As we have stated, the record does not reflect that the Defendant requested *Brady* material other than Mr. Watson's recorded statement. We do not view the evidence as having any obvious exculpatory value. Evidence that provides value for impeachment of a state's witness, however, is within the purview of *Brady*. *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see also United States v. Bagley*, 473 U.S. 667, 767 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The critical inquiry remains, though, whether the evidence was material. In this regard, the inquiry is whether a reasonable probability exists that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see State v. Edgin*, 902 S.W.2d 387, 391 (Tenn. 1995) (op. on pet. for reh'g).

In *Kyles*, the Supreme Court observed:

[The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

In the present case, we cannot conclude that the information was material and therefore subject to *Brady* disclosure. The information that Mr. Snorten initially minimized his own involvement had no bearing on the Defendant's culpability. Although the evidence was relevant to impeach Mr. Snorten, the information was developed at the trial, and defense counsel thoroughly cross-examined Mr. Snorten about inconsistencies in his accounts. In addition to Mr. Snorten's testimony about the Defendant's culpability, the evidence included Mr. Simpson's identification of the Defendant from a photograph lineup and Mr. Simpson's testimony about the Defendant's participation in the robbery in which the victim was killed. The lack of pretrial disclosure does not undermine our confidence in the outcome of the Defendant's trial. He is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE